**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**STEVEN PAUL STOVER,**

      **Plaintiff,**

**v.**                                                    **Case No.: 5:17-cv-01322**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 11, 12).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that

1

Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

In June 2013, Plaintiff Steven Paul Stover ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of October 24, 2011, (Tr. at 269, 276), due to "deteriorating disc disease, severe back problems, and acid reflux." (Tr. at 295). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 158, 171, 178). Claimant filed a request for an administrative hearing, which was held on November 24, 2015, before the Honorable John T. Molleur, Administrative Law Judge (the "ALJ"). (Tr. at 77-115). During the hearing, Claimant amended his alleged onset date to May 15, 2013. (Tr. at 82). By written decision dated December 23, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 61-69). The ALJ's decision became the final decision of the Commissioner on December 23, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-10).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 9, 10). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 11), the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12), and Claimant filed a reply, (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 40 years old at the time that he filed the instant applications for benefits, and 43 years old on the date of the ALJ's decision. (Tr. at 19, 340, 344). He completed the tenth grade in high school and communicates in English. (Tr. at 84, 294). Claimant previously worked as a telemarketing supervisor and retail manager. (Tr. at 109, 296).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative

Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2016. (Tr. at 63, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since May 15, 2013, the amended alleged onset date. (Tr. at 63, Finding No. 2). At the second step of the

evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the lumbar, thoracic, and cervical spine with stenosis." (Tr. at 64, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 64, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is unable to climb ladders, ropes, or scaffolds. The other postural activities are limited to occasional. Reaching with both upper extremities is limited to frequent in all directions. He should have no more than occasional exposure to extremes of cold. He should have no direct exposure to vibrations. There should be no work at unprotected heights. In addition, pushing and pulling is limited to frequent within the weight restrictions of light work.

(Tr. at 64-67, Finding No. 5). At the fourth step, the ALJ determined that Claimant was capable of performing his past relevant work as a telemarketing supervisor. (Tr. at 68, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 68, Finding No. 7).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three challenges to the Commissioner's decision. First, Claimant contends that the ALJ failed to comply with 20 C.F.R. § 404.1527 in assigning little weight to the opinion of Claimant's treating physician, Joseph I. Golden, M.D., who found that Claimant was restricted to a limited range of sedentary work. (ECF No. 11 at 3, 7). Claimant asserts that the ALJ did not provide "good reasons" for not giving controlling weight to Dr. Golden's opinion, as required by Agency regulations. (*Id.* at 7). Claimant argues that while the ALJ summarized some evidence, which he believed

undermined Dr. Golden's opinion, he did not build a "logical bridge" between that evidence and the conclusion that Dr. Golden's opinion should be rejected. (*Id.* at 8).

In his second challenge, Claimant argues that the ALJ misapplied 20 C.F.R. § 404.1513(d) and SSR 06-03p in evaluating the opinion of Crystal Cooper, PA-C, who likewise stated that Claimant could perform work at the sedentary exertional level with additional restrictions. (*Id.* at 8). Claimant argues that the ALJ did not provide justification for rejecting the opinion and incorrectly interpreted the rules and regulations concerning the evaluation of non-acceptable medical source opinions. (*Id.* at 8-10).

Finally, in his third challenge, Claimant states that the ALJ erred in relying almost exclusively on objective evidence to discredit Claimant's allegations of pain and credibility, rather than properly evaluating all of the factors that he was required to consider under 20 C.F.R. §§ 404.1529(c), 416.929(c) and SSR 96-7p . (*Id.* at 10-13).

In response to Claimant's challenges, the Commissioner states that the ALJ properly discounted the opinions of Dr. Golden and Ms. Cooper because they were inconsistent with the medical evidence as discussed by the ALJ. (ECF No. 12 at 8-16). Further, in the Commissioner's view, substantial evidence supports the ALJ's credibility determination. (*Id.* at 17-19).

## V.   **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A.  **Treatment Records**

On February 27, 2013, Claimant presented to Dr. Golden, complaining of severe back pain after he was doing woodworking at a standing table three days prior. (Tr. at

411). Claimant stated that he could not get up from the floor or bear weight. (Tr. at 413). On examination, Claimant's straight leg test was positive for pain in Claimant's back, but not in his legs. (Tr. at 412). Claimant was limping and leaning to the right. (*Id.*). Dr. Golden opined that the pain appeared to be related to muscle spasms because there were no neurological signs at that time. (Tr. at 413). Claimant followed up with Lori Flis, FNP, on March 14, 2013, reporting that his back pain was better. (Tr. at 410). Claimant recounted that he had flares of back pain causing immobility since he suffered an injury 18 years prior. (*Id.*). However, his back pain was improved and he was ambulating without difficulty. (Tr. at 410).

On May 1, 2013, Claimant saw Ms. Flis for an unscheduled visit, again due to increased back pain. Claimant stated that while he was feeding his dogs the day before, his legs "gave out" on him; it felt like a "shot in the lower back" and his right arm was also shaking. (Tr. at 408). Claimant was using a cane. (Tr. at 409). He was started on the muscle relaxer Flexeril and the opioid pain medication Tramadol. (Tr. at 410). The x-rays of Claimant's lumbar and thoracic spine showed minimal spondylosis. (Tr. at 460-61). One week later, Claimant followed up with Ms. Flis and reported that his back pain improved a couple of days after his last visit and he was ambulating much better. (Tr. at 407). He was no longer taking Tramadol, but was taking Flexeril at times. (*Id.*).

On May 15, 2013, the date of Claimant's amended alleged onset of disability, Claimant presented to Raleigh General Hospital with increased back pain. (Tr. at 455). He stated that he had episodes of back pain since suffering a compression fracture of the eighth vertebra in his thoracic spine 20 years prior; however, he stated that the pain recently worsened and persisted longer. (*Id.*). Claimant described the pain in his back as severe, stating it extended into his legs and caused severe weakness. (*Id.*). A

7

MRI of Claimant's thoracic spine showed mild degenerative disc disease with no evidence of fracture or subluxation. (Tr. at 457). The MRI of Claimant's lumbar spine showed a broad-based disc bulge and mild cervical canal narrowing at L3-4; a disc protrusion at L4-5 causing mild foraminal compromise; a disc herniation at L5-S1, most likely causing nerve root sheath impingement and mild foraminal narrowing. (Tr. at 458-59). The following month, on June 6, 2013, Claimant saw Ms. Flis for follow-up regarding his chronic back pain. (Tr. at 402). Claimant was currently doing better and stated that he was being careful as far as activity and taking his medications as needed. (*Id.*). His prescriptions for Flexeril and Tramadol were renewed. (Tr. at 404).

On July 16, 2013, Claimant presented as a new patient for a consultation at WVU Department of Neurosurgery at the referral of Dr. Golden. Claimant related that his neck pain began when he fell in his early twenties and gradually worsened. (Tr. at 370). It radiated from the back of his neck to his shoulders and arms, more so on the right side, and caused varying degree of numbness in his fingers. (*Id.*). Claimant also reported lumbar spine and leg pain with associated weakness and tingling in his legs and feet. (*Id.*). He stated that his low back pain was the worst pain overall. (*Id.*). On examination, Claimant's gait and station, muscle strength and tone in all extremities, sensation, reflexes, and coordination were all normal. (Tr. at 372). His straight leg raising test was negative and he did not have myelopathy. (*Id.*). Given the examination and Claimant's MRI results from May 15, 2013, showing degenerative disc disease, but no herniated discs or cord compression, Claimant was assessed with degenerative joint disease. (Tr. at 372-73).

On August 8, 2013, Claimant saw Crystal M. Cooper, PA-C, regarding his chronic back pain. (Tr. at 401). His lumbosacral spine was tender to palpation, pain

was elicited to motion, and his straight leg test was positive. (Tr. at 401). His prescriptions for Flexeril and Tramadol were renewed. (*Id.*).

The following month, on September 27, 2013, Claimant saw neurosurgeon Rida Mazagri, M.D. (Tr. at 535). Claimant continued to complain of back pain radiating down to his legs and causing numbness, tingling, and burning sensations. (Tr. at 374). He further stated that his legs gave out on him at times, rendering him bed ridden for four to five days at a time. (*Id.*). Claimant's gait was normal, including heel and toe walking, and he had good coordination. (Tr. at 378). The examination of Claimant's muscles and deep tendon reflexes was also normal and, although he had mild restriction of lumbar flexion and extension, his straight leg raising test was negative. (*Id.*). Dr. Mazagri reviewed Claimant's May 15, 2013, lumbar spine MRI results and noted that no major neural compromise was seen. (*Id.*). Dr. Mazagri concluded that Claimant's symptoms were most likely related to multilevel degenerative disc disease in the lumbar spine. (*Id.*). He noted that Claimant was not a candidate for surgical intervention, but would continue Tramadol and Flexeril and could possibly benefit from a nerve block injection. (*Id.*). Dr. Mazagri referred Claimant to the pain management clinic for the nerve block procedure. (Tr. at 376).

Claimant had several subsequent visits with Ms. Cooper to renew his medications and follow up regarding his chronic back pain. (Tr. at 394, 396, 399). On February 17, 2014, Claimant presented to the Beckley Pain Clinic for follow-up after his nerve block procedure. He had a normal gait and normal neurological and musculoskeletal examinations. (Tr. at 500). He stated that the steroid injections helped him some and he was taking Lortab from another provider. (Tr. at 501). Nevertheless, Claimant later continued to complain of neck and back pain to Ms. Cooper on February

27, 2014. (Tr. at 392). An x-ray was taken of Claimant's cervical spine on March 1, 2014 to evaluate his neck pain, but it showed only mild cervical spondylosis. (Tr. at 453). On March 11, 2014, Claimant again saw Ms. Cooper and reported that Lortab was not providing any relief for his neck and low back pain, although he was taking it four times per day. (Tr. at 390).

On March 17, 2014, Claimant presented to the Beckley Pain Clinic for another monthly follow-up appointment. He had a normal gait and normal neurological and musculoskeletal examinations. (Tr. at 497). He reported that steroid injections did not help him; thus, his prescriptions for Lortab and Flexeril were transferred and renewed through the pain clinic. (Tr. at 498). In the following months, Claimant presented to the Beckley Pain Clinic on April 15, 2014, reporting increased leg pain and muscle spasms. (Tr. at 494). However, he had a normal gait and normal neurological and musculoskeletal examinations. (*Id.*). On May 13, 2014, Claimant saw Ms. Cooper, stating that his neck and back pain were unchanged. (Tr. at 389). He stated that Flexeril helped some and he only took Lortab if he could not tolerate the pain. (*Id.*). Two days later, Claimant again presented to the Beckley Pain Clinic for follow up. He had a normal gait and normal neurological and musculoskeletal examinations. (Tr. at 491).

On June 3, 2014, Claimant presented to Ms. Cooper for an unscheduled visit with complaints of increased back pain radiating to his legs; Claimant did not note any new injury, but stated that the increased pain began two days earlier. (Tr. at 387). The assessment was lumbar radiculopathy and the plan was to continue Toradol and DepoMedrol. (Tr. at 388). The same month, on June 17, 2014, Claimant presented to the Beckley Pain Clinic, now stating that the steroid shots that he received two weeks prior were beneficial, but medications did not help him. (Tr. at 488).

10

During Claimant's follow-up visit at the Beckley Pain Clinic on July 15, 2014, Claimant reported that he walked for exercise. (Tr. at 485). He still had a normal gait and normal neurological and musculoskeletal examinations. (*Id.*). Thereafter, on August 13, 2014, Claimant presented to the Beckley Pain Clinic for refills of his pain medications. (Tr. at 481). He stated that his medications were working well. (Tr. at 482). However, he was walking with difficulty and using a cane. (*Id.*).  Two days later, Claimant saw Dr. Mazagri. Claimant continued to complain of pain radiating from his neck into his arms, causing tingling and numbness in his hands, as well as low back pain radiating to his legs. (Tr. at 526). Claimant walked normally with no evidence of limping. (*Id.*). Dr. Mazagri opined that the symptoms were most likely caused by spondylosis, but cord compression in Claimant's neck and carpal tunnel syndrome could not be ruled out; thus, Dr. Mazagri ordered a spinal MRI and EMG study. (*Id.*).

On September 11, 2014, Claimant had another regular monthly follow-up appointment at the Beckley Pain Clinic. He stated that he had good results with his prescribed medications and had no new problems or complications. (Tr. at 479). His musculoskeletal examination revealed normal muscle symmetry, strength, and tone and normal range of motion. (*Id.*). He was to continue on the muscle relaxer Baclofen and pain medication Lortab.

During Claimant's follow-up visit on October 9, 2014 at the Beckley Pain Clinic, he had a normal gait and normal neurological and musculoskeletal examinations. (Tr. at 506-07). At the end of the month, on October 29, 2014, Claimant saw Dr. Mazagri, who reviewed the results of Claimant's spinal MRI scans taken two days prior. (Tr. at 517, 520, 522). In his cervical spine, Claimant had multilevel degenerative disc disease, loss of cervical lordosis, disc herniation/osteophyte complex at C3 through C7, and

mild to moderate stenosis in his cervical spine, but Claimant did not have any major neural compromise. (Tr. at 517). In his lumbar spine, Claimant also had multilevel degenerative disc disease, decreased disc height, disc desiccation, mild disc bulges at L4-S and S-1, but likewise had no major neural compromise and only mild foraminal narrowing. (*Id.*). Claimant presented to Dr. Mazagri using a cane, but was not limping. (*Id.*). He had restriction in lumbar flexion and extension without any evidence of instability. (Tr. at 517, 519). Surgical intervention was not recommended, but Claimant was given the option of a spinal cord stimulator since he reported no relief from steroid injections and narcotic medications. (*Id.*).

On November 10, 2014, Claimant again presented for pain management. He expressed the same complaints of back pain and was using a cane. (Tr. at 542). Claimant did not have any restriction in range of motion and he had normal muscle strength. (*Id.*). Claimant was continued on hydrocodone-acetaminophen. (*Id.*). On December 10, 2014, Claimant again presented for monthly pain management. His gait was normal, but he was in "obvious pain." (Tr. at 538). He still did not have any restriction in range of motion and he had normal muscle strength. (*Id.*). He was again continued on hydrocodone-acetaminophen. (Tr. at 539).

On January 21, 2015, Claimant had an EMG study to evaluate his complaints of pain radiating from his neck into his upper extremities and associated numbness. (Tr. at 550). There was no evidence of entrapment neuropathy or cervical radiculopathy. (Tr. at 551).

On February 6, 2015, Claimant went to the emergency room at Raleigh General Hospital complaining of moderately severe, sharp back pain. He requested Torodol, stating that it worked better than Neurontin and Lortab. (Tr. at 565). Although he

complained of sciatica, his motor examination, sensation, reflexes, and gait were within normal limits. (Tr. at 566). The clinical impression was chronic back pain. (*Id.*).

On April 29, 2015, Claimant saw Dr. Mazagri to discuss a possible spinal cord stimulator. (Tr. at 570). Dr. Mazagri noted that Claimant had been treated conservatively, but continued to express symptoms of chronic pain in his back and right leg. (*Id.*). Claimant's MRI showed multilevel disc disease with disc desiccation, decreased disc height at L3-S1, and foraminal narrowing at L5-S1, mostly on the right side. (*Id.*). On examination, Claimant walked with no evidence of limping, moved his legs well with good strength and tone, intact sensation, and symmetrical deep tendon reflexes. (*Id.*). Before trying a cord stimulator, Dr. Mazagri wanted to try a lumbosacral brace and adjust Claimant's medications. (*Id.*). Dr. Mazagri questioned if Claimant possibly had restless leg syndrome. (*Id.*).

On May 29, 2015, Claimant went to the emergency room at Raleigh General Hospital stating that he fell at home and had dull back pain radiating to his right leg that was similar to his chronic back pain. (Tr. at 573). It was noted that Claimant was using a cane. (*Id.*). His neurological examination was normal. (Tr. at 574). He was administered Torodol and reported improvement. (*Id.*). The impression was an acute exacerbation of chronic low back pain. (*Id.*).

Subsequently, on June 22, 2015, Claimant went to the emergency room at Beckley ARH Hospital with exacerbated neck and back pain. (Tr. at 585). He reported that he recently went to another hospital for the same symptoms, as well as numbness around his mouth; the numbness disappeared after five or six hours and he left the hospital without being seen due to the wait time. (*Id.*). On examination, Claimant did not have any muscular weakness, trouble walking, radicular numbness or tingling. (Tr.

13

at 585, 587). He stated that he had fairly constant shooting, radiating pain from his lumbosacral spine to his right leg. (Tr. at 587). A CT scan of his head showed no changes. (Tr. at 588). He was given prescriptions and discharged the same day. (Tr. at 588-89). Claimant followed up with Ms. Cooper two days later. He had no abnormalities on his sensory or reflexive examinations. (Tr. at 577).

On June 25, 2015, Claimant saw Dr. Mazagri. Claimant was not convinced the lumbar brace given to him at his last visit was helping, but he continued to wear it when he drove or walked long distances. (Tr. at 650). Claimant reported that his symptoms were worse, including constant low back pain radiating into his legs and feet and neck pain radiating into his arms and hands. (*Id.*). Claimant further stated that he had weakness in his right leg and used a cane to walk long distances; also, although he felt strong at times, he dropped things. (*Id.*) Dr. Mazagri decided to postpone a spinal cord stimulator because Claimant's symptoms worsened and obtain updated spinal MRIs. (Tr. at 652).

On August 26, 2015, Claimant saw Dr. Golden for follow-up. He reported that he walked as much as he could, which generally consisted of ten minute walks four times per week. (Tr. at 610). His low back was tender to palpation and his lumbar forward flexion and rotation was restricted, but his sensory and motor examinations were normal. (Tr. at 611-12). He had a normal gait, including his tandem gait, and could squat and rise holding on to a table. (*Id.*).

On September 9, 2015, Claimant saw Dr. Mazagri, who noted that the MRI of Claimant's lumbar spine taken a week prior showed multilevel degenerative disc disease; a mild disc bulge at C3-4 and C4-5 with an annular tear; disc herniation at L5-S1 that was impinging on the right S1 nerve root; and mild foraminal narrowing, more

14

so on the right side. (Tr. at 622-23, 626). Claimant walked into the room using a cane, but was moving all extremities well with good muscle strength and tone and intact sensation. (Tr. at 626). Claimant had restricted lumbar extension and flexion with positive straight leg raising at 80 degrees. (*Id.*). Given the fact that Claimant's MRI now showed a compressive lesion, the plan was to proceed with a partial laminectomy and discectomy at L5-S1 on Claimant's right side. (*Id.*). Dr. Mazagri explained that some back pain would persist, especially due to the degenerative disc disease. (Tr. at 626-27). Claimant saw Dr. Golden for surgical clearance on September 24, 2015. His musculoskeletal and neurological examinations were normal, including a normal gait and stance. (Tr. at 723).

Prior to the surgery, on October 27, 2015, Claimant presented to the emergency room at Raleigh General Hospital reporting that he possibly reinjured his low back "at work" two or three days prior. (Tr. at 743). He had decreased range of motion, but his motor examination, reflexes, and sensation were normal. (Tr. at 744). Claimant saw Dr. Golden again shortly thereafter, on November 4, 2015, but his chief complaint was only that he fell three weeks prior and used his right arm to catch himself, injuring his right shoulder. (Tr. at 719). His motor examination revealed no dysfunction and his gait and stance were still normal. (Tr. at 720).

On December 17, 2015, Claimant had a right partial laminectomy and microdiscectomy at L5-S1. (Tr. at 841). Claimant followed up with Dr. Mazagri on December 23, 2015. He was doing well, was happy with his progress, and wanted to start physical therapy. (Tr. at 954). He was mildly limping, using a cane, and still had some leg pain, but he was moving his legs well with good strength and intact sensation. (*Id.*). A few days later, on December 28, 2015, Claimant saw Dr. Golden. Claimant had

tenderness to palpation in his paralumbar region. (Tr. at 51). His gait and stance were noted to be abnormal, as he was using a cane and favoring his left leg. (*Id.*).

On January 4, 2016, Claimant presented for physical therapy following his back surgery. Claimant stated that he still had constant pain in his lower back, hip, and legs, especially his right leg. (Tr. at 56). He stated that he experienced back spasms in the lumbar region if he lied down for an hour, but changing positions helped relieve his symptoms. (*Id.*). His gait and stance were moderately antalgic and he was using a cane. (*Id.*). His straight leg test was positive. (Tr. at 57).

The next month, on February 3, 2016, Claimant saw Dr. Mazagri. Claimant reported that his leg symptoms improved, but he was still having residual back pain. (Tr. at 37). His main symptom was his neck pain that radiated to his right arm and caused tingling and numbness. (*Id.*). He walked normally around the room with no evidence of limping. (*Id.*). His neck movement was restricted, but he moved his right arm well with good strength and intact sensation. (*Id.*). Dr. Mazagri concluded that the Claimant's symptoms most likely related to cervical spondylosis and ordered a repeat MRI of Claimant's cervical spine and another EMG nerve conduction study. (*Id.*).

On February 9, 2016, Claimant saw Dr. Golden for a six-week follow-up appointment. He stated that his back was still "giving him trouble." (Tr. at 48). However, his gait and stance were normal. (Tr. at 49). Claimant proceeded with the nerve conduction study ordered by Dr. Mazagri on March 7, 2016. The EMG study showed no carpal tunnel syndrome, ulnar entrapment neuropathy, radiculopathy, or other abnormalities. (Tr. at 23). Claimant also had the cervical spine x-ray ordered by Dr. Mazagri, which showed degenerative changes without fracture. (Tr. at 41).

On June 16, 2016, a MRI of Claimant's cervical spine showed overall worsened

appearance of the cervical spine, mild to moderate foraminal narrowing at C5-C6 and C6-C7, and other mild foraminal narrowing and stenosis. (Tr. at 17). Claimant followed up with Dr. Mazagri on July 8, 2016 with continued complaints of neck pain radiating into his shoulders and back. (Tr. at 12). Dr. Mazagri reviewed Claimant's EMG nerve conduction study, noting that there was no evidence of carpal tunnel syndrome. (Tr. at 14). Dr. Mazagri also reviewed the MRI of Claimant's cervical spine taken on June 16, 2016 and x-ray, noting that they only showed multilevel degenerative disease and some foraminal narrowing. (Tr. at 14, 16-17).

### B. Opinion Evidence

On October 3, 2013, Agency expert James Egnor, M.D., assessed Claimant's RFC based upon his review of Claimant's medical records. He found that the objective medical evidence and other evidence in the file did not fully support Claimant's statements about the severity and frequency of his limitations. (Tr. at 122). Dr. Egnor opined that Claimant could perform light level work with the additional limitation that he could perform no more than occasional postural activities. (*Id.*). He also found that Claimant should avoid concentrated exposure to extreme cold and vibration and even moderate exposure to hazards. (Tr. at 123). A. Rafael Gomez, M.D., affirmed Dr. Egnor's RFC assessment, as written, on January 3, 2014. (Tr. at 145-46).

On March 12, 2014, Ms. Cooper completed a medical assessment of ability to do work-related activities form. She opined that Claimant could lift no more than 10 pounds occasionally and 5 pounds frequently; stand or walk for a full work day, but stand, walk, or sit for only 30 minutes without interruption; and perform postural activities occasionally. (Tr. at 581-82). Ms. Cooper found that Claimant was restricted in terms of heights, temperature extremes, and vibration. (Tr. at 582). Further, Ms.

Cooper concluded that Claimant could occasionally reach, handle, or finger objects and frequently feel objects. (Tr. at 583). Ms. Cooper's stated reasoning for Claimant's assessed manipulative limitations was that Claimant reported decreased sensation in his hands and fingers and reported that overhead activities increased his neck and back pain. (*Id.*).

On August 20, 2015, Dr. Golden completed a RFC questionnaire. Dr. Golden noted that Claimant had been his patient since July 1, 2009 and stated that Claimant had low back pain with some radiation into his left leg. (Tr. at 602). Dr. Golden responded that he could not answer whether Claimant was a malingerer, but emotional/psychological factors probably contributed to the severity of Claimant's symptoms. (Tr. at 603). He found that Claimant's pain and other symptoms occasionally interfered with his attention and concentration, but Claimant could tolerate moderate work stress. (*Id.*). Claimant could walk approximately one block without needing to rest or experiencing pain, but he could only sit or stand for 30 minutes at a time. (Tr. at 604). Dr. Golden estimated that Claimant could sit for 6 hours total and stand or walk for 2 hours total in a work day. (*Id.*). Claimant needed to get up and walk for six to ten minutes a total of five to six times in a work day. (Tr. at 605). He required three to four unscheduled breaks of six to ten minutes, had to shift positions, and "probably" needed to use a cane. (*Id.*). Dr. Golden opined that Claimant could rarely lift ten pounds and occasionally lift less than ten pounds. (*Id.*). He could occasionally twist and rarely stoop, and would probably miss work more than four days per month. (Tr. at 606). Dr. Golden stated that he could not judge whether Claimant could work. (Tr. at 607).

### C. Claimant's Statements

During the administrative hearing on November 24, 2015, Claimant testified that he suffered from low back pain; his hips and legs hurt; his right leg gave out a lot, causing him to fall; and he used a cane 75 to 80 percent of the time (Tr. at 97-98). He noted that injections did not help him and he had back surgery scheduled for December 17, 2015. (Tr. at 98-99). Claimant further stated that his legs went numb while sitting and he could not sit for longer than 35 minutes (Tr. at 99-100). He testified that he could stand for 15 minutes, if he could move around, but could not stand in one place due to pain. (Tr. at 101). Claimant stated that it had been "a while" since he lifted anything, but estimated that he could not lift more than 8 to 10 pounds. (Tr. at 102). Also, he testified that his hands were always tingling and slightly numb, which made it hard to hold anything or put on shoes and socks and sometimes his pants. (Tr. at 103).

Claimant stated that he delivered a few sermons a week in his capacity as a volunteer pastor at a church and in overseeing his own small congregation, although Claimant claimed that he had to cancel three out of the past six services due to back pain. (Tr. at 85, 92). Claimant officiated a wedding and two funerals, but noted that he was unable officiate a recent funeral because his "back was out" and he could not walk to the grave site. (Tr. at 89). Claimant also emphasized that, when preaching, he changed positions from sitting to standing and walked around some. (Tr. at 104). Claimant stated that he otherwise stayed at home most of the time, but walked around outside and drove to Wal-Mart to walk around when he could not sleep and it was too cold to walk outside. (Tr. at 95).

### VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is

based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

### A. Treating Physician

In his first challenge to the Commissioner's decision, Claimant contends that the ALJ failed to comply with 20 C.F.R. § 404.1527 in assigning little weight to Dr. Golden's opinion that Claimant was limited to less than sedentary work. (ECF No. 11 at 3, 7). Claimant states that the only reason the ALJ provided for assigning little weight to the opinion was that "the record does not support a finding that Claimant was limited to a sedentary level of activity." (*Id.* at 7). Claimant contends that not only is

this bare statement not a "good reason," as required by Agency regulations, but it is not supported by substantial evidence and does not justify the markedly reduced weight assigned to the opinion. (*Id.*). Moreover, Claimant argues that the ALJ did not cite any "persuasive contrary evidence" to support the lack of weight assigned to Dr. Golden's opinion and, although the ALJ summarized some evidence that he believed undermined Dr. Golden's opinion, he did not build a "logical bridge" between that evidence and the conclusion that Dr. Golden's opinion should be rejected. (*Id.* at 8).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and

21

laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. Jul. 2, 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* §§ 404.1527(c)(4), 416.927(c)(4) Ultimately, it is the responsibility of the ALJ, not the Court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts

of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Here, the ALJ acknowledged Dr. Golden's August 2015 opinion that Claimant could only stand or walk for a total of two hours in a workday, with the remainder of the time spent sitting, except that Claimant could not sit, stand, or walk for more than 30 minutes at a time and would require three to four unscheduled breaks during the work day, each lasting five to ten minutes. (Tr. at 68). As noted by the ALJ, Dr. Golden found that Claimant needed to walk five to six times per day for five to ten minutes at a time and could rarely lift ten pounds and occasionally lift or carry less than ten pounds. (*Id.*).

However, the ALJ found that the record did not support a finding that Claimant was limited to the sedentary exertional level of activity assessed by Dr. Golden. (*Id.*). The ALJ noted that there was no evidence of radiculopathy or neural compromise on Claimant's diagnostic studies. (*Id.*). Also, the ALJ stated that Claimant's recent clinical examinations documented that he had a normal gait and only mild tenderness in the lower lumbar area with full range of motion in his hips, negative straight leg raising, and full muscle strength. (*Id.*).

As shown above, Claimant is incorrect that the only reason that the ALJ provided for discounting Dr. Golden's opinion was that it was "not supported by the record." Rather, the ALJ concluded that there was simply an absence of evidence to support the degree of limitation found by Dr. Golden and even Claimant's later records confirmed the absence of any significant neural compromise. The ALJ's conclusions are well-supported by his analysis of the medical evidence. The ALJ cited that Claimant's records in July 2013 showed that Claimant had degenerative disc disease in his lumbar spine that was not causing any major neural compromise. Claimant had a normal gait and negative straight leg raises, as well as normal muscle strength, muscle

24

tone, and sensation on examination. (Tr. at 65). The ALJ further noted that diagnostic studies also showed only mild cervical spondylosis and mild degenerative disc disease of the dorsal spine. (Tr. at 65-66). The ALJ pointed out that Claimant was treated with medication at the Pain Clinic and was stable on his medication regime. (Tr. at 66). The ALJ acknowledged that Claimant did continue to express pain complaints and, in September 2015, a MRI showed that Claimant had a right paramedian disc protrusion impinging on the right exiting nerve root at the L5-S1 level. However, Dr. Mazagri scheduled Claimant for a partial laminectomy and discectomy due to his continued complaints of moderate pain. (*Id.*). As the record reflects, the surgery provided Claimant with significant relief from his symptoms.

The ALJ stated that, in sum, Claimant's treatment was largely conservative since his onset date notwithstanding the planned surgery, and there was an absence of objective evidence to demonstrate radiculopathy or neural compromise. (*Id.*). In fact, the ALJ noted that Claimant's examinations in July and November 2015, the latter of which was the month prior to Claimant's surgery, reflected that Claimant had a normal gait, only mild tenderness in the lumbar region, full range of motion in his hips, negative straight leg raises, and normal strength in all of his extremities. (*Id.*). In addition, the ALJ found it significant that Claimant continued to work as a pastor despite his alleged disability. (*Id.*).

Judicial review of an ALJ's analysis of medical opinions, such as Dr. Golden's opinion, is a limited one. While the opinions of treating physicians must be afforded significant consideration, and the presumption of controlling weight, it is the sole province of the ALJ to weigh the medical opinions against the record. As noted, an ALJ is not obligated to give a medical opinion controlling weight if the ALJ concludes that

it is inconsistent with substantial evidence or not supported by clinical findings. Ultimately, "[a]n ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (internal markings and citations omitted). In other words, the Court "must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence." (*Id.* at 271).

In this case, the ALJ's assignment of little weight to Claimant's treating physician Dr. Golden's opinion is supported by substantial evidence. In early 2013, Claimant complained of back pain, but Dr. Golden opined that it might be caused by muscle spasms, as he did not see any neurological signs at that time. (Tr. at 413). In March 2013, Claimant said his back pain was better and although he complained of a flare of back pain in May 2013, he stated that it lasted only a few days. (Tr. at 407, 410). Claimant reported that he had flares of such back pain for 18 years, which was well before his alleged onset date and during the period that he was working. (Tr. at 410). On his amended onset date, May 15, 2013, Claimant stated that his episodes of back pain were worsening and lasting longer, extending into his legs and causing weakness. (Tr. at 455). However, Claimant's MRI results only showed mild spinal stenosis and, by early June 2013, Claimant said that he was doing better. (Tr. at 402). In July 2013, Claimant again endorsed back and neck pain that was radiating and causing numbness, tingling, and weakness in his extremities. (Tr. at 370). Yet, Claimant's examination revealed normal gait and station, muscle strength and tone, sensation, reflexes, and coordination. (Tr. at 372). His straight leg raising test was negative and his MRI

showed no herniated discs or cord compression. (*Id.*). Further, although Ms. Cooper noted Claimant's straight leg raising test to be positive in August 2013, Dr. Mazagri found it to be negative the following month. (Tr. at 378, 401). Dr. Mazagri also found in September 2013 that Claimant had a normal gait, including heel and toe walking; good coordination; and a normal muscular examination. (Tr. at 378).

Throughout 2014 Claimant continued to complain of back and neck pain; however, his neurological and muscular examinations remained normal and his gait was almost always noted as normal, except for minimal, intermittent occasions when he presented with a cane. (Tr. at 389, 390, 392, 394, 396, 479, 485, 491, 494, 497, 500, 506-07, 517, 535). Dr. Mazagri noted in October 2014 that Claimant's MRI results showed no major neural compromise. (Tr. at 517). In February 2015, Claimant still complained of sciatica, but his motor examination, sensation, reflexes, and gait were all within normal limits. (Tr. at 566). In April 2015, Dr. Mazagri noted that Claimant had been treated conservatively, but he continued to complain of pain. (Tr. at 570). Nevertheless, Claimant walked at that appointment with no evidence of limping, moved his legs well with good strength and tone, intact sensation, and symmetrical deep tendon reflexes. (Tr. at 570). Claimant later reported an exacerbation of dull low back pain in May 2015 after falling at home, but his neurological examination was normal and he reported improvement from Toradol. (Tr. at 573-74). Claimant also reported back pain radiating into his right leg in June 2015, but he did not have any muscular weakness, trouble walking, radicular numbness or tingling. (Tr. at 577, 585, 587).

In late 2015, Claimant's MRI did show an impinged nerve in Claimant's low back and he had a partial laminectomy and microdiscectomy in December 2015. (Tr. at 622-

23, 626). By February 2016, Claimant stated that he still had some residual back pain, but his leg symptoms improved and he walked normally with no evidence of limping. (Tr. at 37, 49). Claimant's pain complaints shifted focus to his neck pain radiating to his arms and hands. (Tr. at 37). Yet, Claimant's nerve conduction study in March 2016 was negative and the MRI of his cervical spine in June 2016 showed only degenerative changes with no significant neural compromise noted. (Tr. at 14, 16-17, 23, 41).

Based upon the above, the undersigned **FINDS** that there is sufficiently more than a mere scintilla of evidence to support the ALJ's decision to assign little weight to Claimant's treating physician Dr. Golden's opinion. *Hays*, 907 F.2d at 1456 (Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."). While there was also evidence in the record to substantiate Claimant's back and neck impairments to some degree, the ALJ reasonably analyzed and weighed the conflicting evidence in the record, including Claimant's medical records and Claimant's work activity as a pastor, resolved the conflicts and properly concluded that Claimant was capable of more than a limited range of sedentary activities.

### B. Non-Acceptable Medical Source

In his second challenge, Claimant argues that the ALJ misapplied 20 C.F.R. § 404.1513(d) and SSR 06-03p in evaluating the opinion of Claimant's treating physician's assistant, Ms. Cooper, who likewise stated that Claimant could perform work at less than the sedentary exertional level. (*Id.* at 8). Claimant argues that the ALJ did not provide justification for rejecting the opinion and incorrectly interpreted the rules and regulations concerning the evaluation of non-acceptable medical source opinions. (ECF No. 11 at 8-10).

The ALJ may use evidence from other sources "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, at *2; *see also* 20 C.F.R. § 416.913(d). The Ruling discusses how the ALJ should address other source opinions in the written decision, indicating that "the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." *Id.* at *6. If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d 700, 705 (3rd Cir. 1981)). As stated earlier, it is the ALJ's responsibility to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays*, 907 F.2d at 1456, and provide good reasons in the written decision for the weight given to the opinions. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

Here, the ALJ noted Ms. Cooper's March 2014 opinion that Claimant could occasionally lift and carry 10 pounds; frequently lift and carry 5 pounds; and stand and walk for a total of 8 hours, but only stand, walk, or sit for 30 minutes without interruption. (Tr. at 67). However, the ALJ assigned little weight to the opinion, noting that while Claimant's diagnostic studies showed mild stenosis, there was no evidence of radiculopathy or neural compromise and Claimant had normal neurological,

muscular, and motor findings. (*Id.*). Further, the ALJ noted that a physician's assistant, such as Ms. Cooper, is not an acceptable medical source under the applicable rules and regulations and her opinion, standing alone, cannot constitute documentation of severe or disabling vocational limitations. (*Id.*). Despite that, the ALJ stated that Ms. Cooper's opinion was considered with respect to the severity of Claimant's impairments and the functional effects of his impairments. (*Id.*).

More than a mere scintilla of evidence supports the ALJ's above assessment that while Claimant had degenerative changes, some spinal stenosis, and eventually an impinged nerve requiring surgery, the evidence ultimately did not support the sedentary level limitations alleged by Ms. Cooper. As stated by the ALJ, Claimant's records did not show significant neural compromise and Claimant consistently had normal findings on examination. Indeed, although Claimant complained of numbness and tingling in his extremities, there is no evidence of muscle weakness or atrophy and his sensation remained intact. With the exception of a handful of occasions, Claimant consistently had a normal gait and stance, even as late as February 2016. (Tr. at 49). Overall, the undersigned **FINDS** that the ALJ fulfilled his duty to consider and weigh Ms. Cooper's opinion.

### C. Credibility

Finally, in his third challenge, Claimant states that the ALJ erred in relying almost exclusively on objective evidence to discredit Claimant's allegations of pain and credibility, rather than properly evaluating all of the factors that he was required to consider under 20 C.F.R. §§ 404.1529(c), 416.929(c) and SSR 96-7p. (ECF No. 11 at 10-13).

Under the Social Security rulings and regulations, an ALJ is obliged to use a

two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any

other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at \*4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at \*6.

In its rulings, the SSA provides further guidance on how to evaluate a claimant's credibility, stating "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at \*5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at \*6-7. A longitudinal medical record

demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this matter, the ALJ correctly applied the two-step method to assess the reliability of Claimant's statements. The ALJ considered Claimant's reports that he suffered from chronic back pain with radiculopathy, he used a cane most of the time, his legs "give out" on him occasionally, and he was going to undergo back surgery in December 2015, as injections and other conservative measures did not help him. (Tr. at 65). The ALJ also considered Claimant's statements that he could stand for 15

33

minutes at a time, lift 8 to 10 pounds, and needed to change positions due to pain. (*Id.*). The ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible for various reasons. First, the ALJ noted that Claimant was treated conservatively notwithstanding his planned surgery. (Tr. at 65-66). Further, the ALJ considered that while diagnostic studies showed mild stenosis in Claimant's spine, they did not reflect any significant neural compromise or radiculopathy and Claimant's physical examinations were largely normal. (Tr. at 66). The ALJ thoroughly discussed Claimant's medical records, including the notations that Claimant maintained a normal gait and muscle strength in his extremities throughout the relevant period. (Tr. at 65-66). Also, the ALJ considered Claimant's work activity as a pastor after the amended onset date. While the work activity did not constitute disqualifying substantial gainful activity, the ALJ found that Claimant's activities as a pastor in overseeing his own ministry, serving as a volunteer pastor at another church, presiding over functions, and performing outreach activities reflected work-related function in excess of what Claimant alleged. (Tr. at 66-67). The ALJ also considered the various opinion evidence offered in this matter. (Tr. at 67-68).

As shown above, the ALJ provided clear reasons, supported by the record, for his assessment that Claimant's statements was not fully credible. The ALJ did not address the credibility issue in a conclusory fashion, nor the did the ALJ impermissibly find Claimant's representations to be less than fully reliable solely because there was no objective evidence to support his statements. Rather, the ALJ carefully reviewed the record and found that Claimant's testing and examinations revealed evidence that was

contrary to the symptoms and limitations which he alleged, such as the fact that Claimant was frequently observed to be walking normally with good muscle strength and other normal findings. This analysis is clearly documented in the ALJ's decision. Further, the ALJ considered Claimant's work as a pastor and determined that such evidence did not fully reconcile with Claimant's allegations that he was precluded from any substantial gainful activity. In sum, the undersigned **FINDS** that the ALJ's credibility analysis was properly conducted in compliance with the applicable mandates, and his determination was supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 11); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by

the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 12, 2018

Cheryl A. Eifert
United States Magistrate Judge